1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Javier Torres and Lia Rivadeneyra, on)        No. CV 06-2482-PHX-SMM
     behalf of themselves and others similarly)
10   situated,                             )        **ORDER**
                                           )
11               Plaintiffs,               )
                                           )
12   v.                                    )
                                           )
13   Thomas C. Horne, Attorney General of the)
     State of Arizona, in his official capacity,)
14   Terry Goddard, in his individual capacity,)
     and Cameron ("Kip") Holmes, in his)
15   individual capacity,                  )
                                           )
16               Defendants.               )
     _____)

17

18        Before the Court is Defendants' Motion for Summary Judgment on All Claims (Re:

     Standing) (Doc. 196). Plaintiffs responded (Doc. 201), Defendants replied (Doc. 213), and
19
     the matter is now fully briefed.[1] Having considered the parties' memoranda and other
20
     submissions, the Court now issues this Memorandum of Decision and Order denying
21
     Defendants' Motion.
22

23

24

25   _____

26        [1] Defendants and Plaintiffs requested oral argument in connection with their Motion
     for Summary Judgment and Response, respectively. (Docs. 196, 201.) The parties have had
27   the opportunity to submit briefing. Accordingly, the Court finds the pending motions suitable
     for decision without oral argument and Defendants and Plaintiffs' requests are denied. See
28   L.R. Civ. 7.2(f).

1

**BACKGROUND**

2      Since at least October 2000, an Arizona Financial Crimes Task Force (the "Task

3  Force") has worked to interrupt proceeds from narcotics trafficking and alien smuggling to

4  and from Arizona. (Plaintiffs' Responses to Defendants' Separate Statement of Facts in

5  Support of Motion for Summary Judgment on All Claims (Re: Standing) ("PRSOF") ¶ 1.)

6  The Task Force, which includes Defendants, has obtained warrants authorizing the seizure

7  for forfeiture of electronic credits from Western Union Financial Services, Inc. ("Western

8  Union"). (PRSOF ¶ 2.) Since 2004, Defendants have seized more than $9,000,000 from

9  thousands of people throughout the United States pursuant to these warrants. (Doc. 183 at

10  2.) The two Plaintiffs in this case, Javier Torres and Lia Rivadeneyra, met the criteria set

11  forth in the seizure warrants, and the funds they sent through Western Union were seized.

12  (PRSOF ¶ 6.)

13      When the events that are the subject of this lawsuit occurred, Western Union operated

14  through independent contracts with its authorized agents. (PRSOF ¶ 8.) Western Union's

15  will-call transfer service allowed customers to provide money to Western Union for transfer

16  to a designated receiver, who could retrieve the amount designated for transfer at any

17  Western Union agent location. (PRSOF ¶¶ 7, 9, 10.) Western Union and its sender customers

18  agreed to contractual terms and conditions, which governed these money transfers. (PRSOF

19  ¶ 11.) A customer was required to complete a "Send Money" form, provide supporting

20  documents, and submit the amount of money designated for transfer along with a service fee.

21  (PRSOF ¶ 12.) An authorized agent would then enter the required transaction information,

22  which was transmitted to Western Union's data processing system. (PRSOF ¶¶ 13, 14.) The

23  sender would then receive a Money Transmitter Control Number ("MTCN") to share with

24  the designated receiver for use at pick-up. (PRSOF ¶ 15.)

25      Rather than sending the currency the sender submitted, the Western Union agent either

26  deposited the money in the agent's own bank account in trust for Western Union or

27  maintained an equivalent amount of money in trust in the bank account. (PRSOF ¶ 16.) Once

28  Western Union deemed the money in the agent's bank account sufficient to cover the

transfer, one of two processes would occur. (PRSOF ¶¶ 17-19.) For most Western Union agents, Western Union created an Automated Clearing House file that would debit the agent's bank account for the amount submitted by the sender, and that debit would be sent to the agent's Originating Depository Financial Institution so that Western Union would receive a credit for the amount submitted on the following business day. (PRSOF ¶¶ 17, 18.) For certain larger agents, Western Union accepted amounts delivered through the Federal Reserve wire process directly from the agents' account into Western Union's operating account. (PRSOF ¶ 19.) Once Western Union's account was credited, Western Union's mainframe would show that the funds were available within about ten to fifteen minutes. (PRSOF ¶ 20.)

The recipient initiated the transaction by appearing at a Western Union agent's location, completing a "Receive Money" form, and providing proper identification and the correct MTCN number. (PRSOF ¶ 21.) Once the recipient provided the information, the Agent would enter the transaction into a point-of-sale computer linked to Western Union's processing center and mainframe. (PRSOF ¶ 22.) For transactions completed within the United States, an agent would locate the transaction on Western Union's mainframe, then print out a money transfer check drawn on Western Union's clearing account. (PSOF ¶ 23.) The receiver would then sign the check over to the agent, who would issue cash, and later receive reimbursement from Western Union. (PRSOF ¶ 23.) For transactions completed in Mexico, the agent would locate the transaction on Western Union's mainframe, then pay the receiver in cash, reconciling with Western Union the amounts paid out. (PRSOF ¶ 24.)

The agreement between Western Union and the sender included certain terms and conditions. (PRSOF ¶ 27.) First, Western Union stated that it permitted refunds of the transfer amount up until the money was paid to the receiver. (PRSOF ¶ 28.) Second, the service fees were refundable only if Western Union did not make the funds available in the time promised in the agreement. (PRSOF ¶ 29.) Third, in California, senders were entitled to a refund if the money sent was not forwarded within 10 days. (PRSOF ¶ 30.) Fourth,

senders seeking a refund were required to submit a written refund request to Western Union. (PRSOF ¶ 31.)

This payout process, as it pertained to Plaintiffs and others, was interrupted by Defendants' service on Western Union of a series of seizure warrants. When each warrant was served, Western Union was required to "hold" all customers' wire transfer transactions meeting the warrant criteria and then pay the funds from the transactions into a detention account. (Plaintiffs' Statement of Additional Facts Precluding Summary Judgment ("PSOF") ¶¶ 3, 11.) From the detention account, the seized funds were intended to be transferred to an account of the Clerk of the Maricopa County, Arizona Superior Court, where they would be subject to forfeiture. (PSOF ¶ 3; PRSOF ¶ 54.) During the effective dates of the warrant, representatives of the State of Arizona were available by phone to speak with senders and receivers regarding the seizure of the funds. (PSOF ¶¶ 34, 38.) After questioning the caller about the transaction, the representative determined whether to allow the transaction to be completed. (Doc. 80, Ex. K ¶¶ 3-4.) If no one called or the person calling failed to demonstrate that the money was for a legal purpose, the money transfer was to be forfeited. (PSOF ¶¶ 1, 8; Doc. 80, Ex. K ¶¶ 3-4.) When Defendants instituted forfeiture proceedings, the senders did not receive written notice of the pending forfeiture. (PSOF ¶ 22; Doc. 51 at 6.)

In March 2006, Torres completed the necessary paperwork at a Western Union agent in Illinois to send between $920 and $1,000 to Claudia Vasquez in Arizona as proceeds from the sale of Vasquez's car. (PRSOF ¶¶ 32, 36, 37, 39.) It is undisputed that Torres promised Vasquez half the proceeds from selling a car (PRSOF ¶ 41), but it is disputed whether Vasquez sold the car to Torres, who then resold it, or whether Torres sold the car on behalf of Vasquez. (PRSOF ¶¶ 39-41.) Vasquez remained the single title holder of the vehicle, but left Torres a signed "open title" to the vehicle. (PRSOF ¶ 46.)

Torres met the criteria set forth in the seizure warrants obtained by Defendants, which was stored in Western Union's system. (PRSOF ¶ 33.) The warrant applicable to Torres caused his transfer to be diverted to Western Union customer service employees, and was

unavailable for pick-up by Vasquez. (PRSOF ¶ 34.) When Torres called representatives of the State of Arizona to discuss the seizure, he was told that "the money was detained by the State of Arizona." (PSOF ¶ 34.) Vasquez never received the money that Torres attempted to send her, so Torres mailed Vasquez a check for $1,000 instead. (PSOF ¶¶ 30-31.)

In September 2006, Rivadeneyra went to a Western Union agent in South San Francisco, California to transfer $500 to her brother in Sonora, Mexico. (PRSOF ¶¶ 47, 49-50; PSOF ¶ 35.) Rivadeneyra's transfer was stopped pursuant to a warrant obtained by Defendants (the "Sonora warrant"), and the funds were diverted into a Western Union detention account once the receiver requested the money. (PRSOF ¶¶ 35, 53.) Rivadeneyra spoke with a representative of the State of Arizona and stated that the money derived from her job. (PSOF ¶ 38.) Rivadeneyra claims that she would send money through Western Union, but only with assurances that it would not be seized. (PSOF ¶ 39; Doc. 205, Ex. J.)

The State of Arizona never gained possession of the funds Rivadeneyra sent. (PRSOF ¶ 54). In October 2006, Western Union filed a lawsuit in Maricopa County Superior Court pertaining to the Sonora warrant, and obtained a preliminary injunction that prevented Western Union from having to transfer Sonora warrant funds to the Maricopa County Superior Court Clerk for forfeiture proceedings. (PRSOF ¶ 54.) In February 2010, the State of Arizona and Western Union reached a settlement that allowed Western Union to release funds seized pursuant to the Sonora warrant. (PRSOF ¶ 55.) Defendant Holmes has stated that senders whose funds were seized are eligible for a refund from Western Union. (Doc. 197, Ex. 8 ¶¶ 6-7.)

## PROCEDURAL BACKGROUND

On October 18, 2006, Plaintiffs filed their Complaint pursuant to 42 U.S.C. § 1983, alleging: (1) Defendants lacked probable cause to believe that the monies seized were the fruits or instrumentalities of crimes or otherwise subject to forfeiture in violation of the Fourth Amendment; (2) the seizure warrants were overly broad on their face in violation of the Fourth Amendment; (3) Defendants failed to give adequate and timely notice that their monies would be seized, and failed to provide a prompt post-seizure hearing to contest the

1   seizures, all in violation of due process; and (4) Defendants interfered improperly with

2   interstate and international commerce in violation of the Commerce Clause. (Doc. 1.)

3   Plaintiffs' Complaint was subsequently amended twice, but the substantive claims remain

4   the same. (Docs. 47, 141). On March 31, 2010, the Court denied Plaintiffs' Motion for Class

5   Certification (Doc. 79) of these claims. (Doc. 183.) Subsequently, the Ninth Circuit denied

6   Plaintiffs' request for permission to appeal the Court's order denying class action

7   certification. (Doc. 184); Torres v. Goddard, No. 10-80086 (9th Cir. June 14, 2010).

8       Defendants filed their Motion for Summary Judgment on All Claims (Re: Standing)

9   (Doc. 196), arguing that Plaintiffs have insufficient legal interest in the money they claim

10  was illegally seized because any interest was relinquished when they paid Western Union.

11  (Doc. 196 at 1). Defendants contend that: (1) Plaintiffs' contract with Western Union created

12  a debtor-creditor relationship that cannot confer standing; (2) Torres sent proceeds from a

13  car sale that he brokered, so the funds never belonged to him; and (3) Rivadeneyra's claims

14  are moot because the State of Arizona never had custody of her funds, giving Western Union

15  sole discretion to issue her a refund. (Doc. 196 at 1-2.) Plaintiffs assert standing to sue on

16  grounds that: (1) Plaintiffs maintained a property interest in the transferred funds; (2) the

17  money Torres sent belonged to him; and (3) the State of Arizona, rather than Western Union,

18  seized the funds, which were not returned despite Plaintiffs' requests. (Doc. 201 at 2-3).

19  **STANDARD OF REVIEW**

20      A court must grant summary judgment if the pleadings and supporting documents,

21  viewed in the light most favorable to the nonmoving party, "show[] that there is no genuine

22  dispute as to any material fact and the movant is entitled to judgment as a matter of law"

23  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v.

24  Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines

25  which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

26  see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome

27  of the suit under the governing law will properly preclude the entry of summary judgment."

28  Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be

1  "such that a reasonable jury could return a verdict for the nonmoving party." Id.; see

2  Jesinger, 24 F.3d at 1130.

3      A principal purpose of summary judgment is "to isolate and dispose of factually

4  unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against

5  a party who "fails to make a showing sufficient to establish the existence of an element

6  essential to that party's case as to which that party will bear the burden of proof at trial." Id.

7  at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The

8  moving party need not disprove matters on which the opponent has the burden of proof at

9  trial. See Celotex, 477 U.S. at 323-24. The party opposing summary judgment need not

10  produce evidence "in a form that would be admissible at trial in order to avoid summary

11  judgment." Id. at 324. However, the nonmovant must set out specific facts showing a genuine

12  dispute for trial. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574,

13  585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

14                                              **DISCUSSION**

15  **I.   Defendants' Motion for Summary Judgment Based on Lack of Standing**

16      Defendants argue that Plaintiffs lack legal standing on grounds that: (1) Plaintiffs were

17  creditors of Western Union, not titleholders to the seized funds and (2) Torres merely

18  transferred Vasquez's proceeds from the car sale, and thus had no interest in the funds. (Doc.

19  196 at 2, 4). Standing represents the constitutional requirement that every plaintiff have a

20  personal stake in the litigation.  See Ex parte Levitt, 302 U.S. 633, 636 (1937); Warth v.

21  Seldin, 422 U.S. 490, 498 (1975). To demonstrate standing under Article III, a plaintiff must

22  allege facts that "present the court with a 'case or controversy' in the constitutional sense and

23  that she is a proper plaintiff to raise the issues sought to be litigated." Linda R.S. v. Richard

24  D., 410 U.S. 614, 616 (1973); Allen v. Wright, 468 U.S. 737, 751 (1984). Meeting minimum

25  standing requirements under Article III requires a plaintiff to allege an injury that is: (1)

26  actual or imminent, both particularized and concrete; (2) caused by defendant's challenged

27

28

1   action; and (3) likely to be redressed by a court's favorable decision.[2] See Lujan v. Defenders

2   of Wildlife, 504 U.S. 555, 560-61 (1992); Cnty. of Riverside v. McLaughlin, 500 U.S. 44,

3   50-51 (1991) (Article III standing in Fourth Amendment case); On the Green Apartments,

4   L.L.C. v. City of Tacoma, 241 F.3d 1235, 1239 (9th Cir. 2001) (Article III standing in

5   Commerce Clause case); Waterfront Renaissance Assocs. v. City of Phila., 701 F. Supp. 2d

6   633, 640 (E.D. Pa. 2010) (Article III standing in substantive due process case). The Court

7   will evaluate Defendants' standing challenge in light of Plaintiffs' claims.

8   **A.    Plaintiffs' Fourth Amendment Claims (Counts I and II)**

9       Count I of Plaintiffs' Second Amended Complaint alleges that Defendants' "blanket

10   criteria-based seizures . . . were done without probable cause to believe that the funds were

11   the fruits or instrumentalities of crimes, or otherwise subject to forfeiture under Arizona

12   law." (Doc. 141 ¶¶ 45-46). Count II alleges another Fourth Amendment violation, that

13   Defendants' warrants were "overbroad on their face." (Doc. 141 ¶¶ 47-48.) Defendants cite

14   several cases addressing Article III standing in the context of 42 U.S.C. § 1983 lawsuits.[3]

15

_____

16       [2]Defendants' Motion for Summary Judgment cites forfeiture cases, which often

17   require both: (1) Article III standing and (2) statutory standing, such as the filing of a verified
    statement of interest or proof of superior interest in property. (Doc. 196 at 2-3 (citing United

18   States v. BCCI Holdings (Luxembourg), S.A., 69 F. Supp. 2d 36, 52 (D.D.C. 1999); United
    States v. $38,000.00 in U.S. Currency, 816 F.2d 1538, 1543 (11th Cir. 1987)).) Plaintiffs

19   assert that because their lawsuit alleges constitutional violations, Defendants' alleged

20   reliance on forfeiture cases requires the Court to deny the Motion for Summary Judgment.
    (Doc. 201 at 5.) Though Defendants' Motion for Summary Judgment could have been more

21   clear in reference to Article III standing, Defendants' Reply does specify that they seek
    summary judgment based on lack of Article III standing. (Doc. 213 at 5 ("the Court must

22   apply Article III standards").)

23
        [3](Docs. 196 at 2; 213 at 5 (citing McLaughlin, 500 U.S. at 50-51 (plaintiffs arrested

24   without warrants and held without probable cause determinations had standing because
    injunctive relief could redress their alleged injuries); Brouhard v. Lee, 125 F.3d 656 (8th Cir.

25   1997) (plaintiffs detained for drunken driving lacked standing to challenge police questioning

26   and license checks without reasonable cause, because plaintiffs did not suffer alleged harm);
    Stocker v. Hood, 927 F. Supp. 871, 873 (E.D. Pa. 1996) (plaintiff lacked standing to

27   challenge property forfeiture because earlier had denied ownership); Ruttenberg v. Jones,

28   603 F. Supp. 2d 844, 861 (E.D. Va. 2009) (owner present during warrantless administrative

These cases' relevance can be reduced to the principle that Article III standing requires that plaintiffs allege an actual or imminent injury caused by defendants' challenged action that can be redressed by a favorable ruling. McLaughlin, 500 U.S. at 50-51. Defendants first contend that Plaintiffs were not injured by the seizure because they are merely Western Union's creditors and have no interest in the sent funds. (Doc. 196.) However, Defendants rely on holdings primarily from outside the Ninth Circuit that are based upon state law, forfeiture statutes, or common law claims, which are inapplicable to the constitutional claims in this case.[4] (Doc. 196 at 8, 9, 12.) Defendants also assert that Torres could not have been harmed because he was merely a "straw owner" who was merely sending funds owed as a debt to Vasquez. See (Doc. 196 at 14 (citing United States v. One 1973 Rolls Royce, 43 F.3d 794, 806 n.8 (nominal or straw owners lack standing to challenge forfeitures under state law and drug forfeiture statutes)).) Plaintiffs maintain that they have standing to challenge Defendants' seizure by virtue of their interest in the money paid to Western Union. (Doc. 201.)

The Court finds that Plaintiffs have Article III standing to bring their claims, because Plaintiffs have alleged an actual injury, that Defendants directed the seizure and detention of funds Plaintiffs sent through Western Union. (Doc. 141); see also Lujan, 504 U.S. at 560-61. Plaintiffs, as senders of funds, had a contractual relationship with Western Union. W. Un. Tel. Co. v. Nester, 309 U.S. 582, 588 (1940). Though Plaintiffs sent funds in accordance with

---

search of pool hall had standing, while owner absent from premises lacked standing); Stewart v. City of Red Wing, 554 F. Supp. 2d 924, 930 (D. Minn. 2008) (plaintiffs challenging licensing requirements for rental properties lacked standing because never inspected)).)

[4]For example, Defendants' reliance on United States v. All Funds on Deposit in the Name Kahn, et al., 955 F. Supp. 23, 27 (E.D.N.Y. 1997), which addresses Article III standing in the forfeiture context, is misplaced because Plaintiffs here allege constitutional violations. Further, unlike in Kahn, Plaintiffs here had a contract requiring Western Union to transmit funds and allowing Plaintiffs to demand a refund prior to the receiver taking possession. (Doc. 201 at 12.) Also, the determination of whether the plaintiffs in Kahn could demonstrate standing was dependent on New York state law, which is inapplicable to this case. Kahn, 955 F. Supp. at 26.

their contract with Western Union, these funds were seized before reaching their intended receivers because of seizure warrants that Defendants obtained. (PRSOF ¶¶ 34-35, 53.) Plaintiffs' contract with Western Union entitled them to a timely refund of the sent funds provided that the funds had not yet been paid to the receiver. (PRSOF ¶¶ 28-31.) However, this right to a timely refund became unavailable to Plaintiffs when the funds were diverted at Defendants' direction. (PSOF ¶¶ 34, 38.) When Plaintiffs learned that their funds had not been transmitted to their receivers, they were required to speak with representatives of Defendants to receive information about those funds. (PSOF ¶¶ 34, 38.) Defendants' assertion that Plaintiffs somehow surrendered any interest in the sent funds upon paying Western Union conflicts with Defendants' own position in prior state court litigation, where they asserted that Western Union had no interest in the sent funds. See State v. W. Union Fin. Servs., 199 P.3d 592, 607 (Ariz. App. 2008), vacated, 208 P.3d 218 (Ariz. 2009) ("According to the State, because W[estern] U[nion] did not own the funds represented by [the electronic credits] and had no beneficial interest in them, it was not permitted 'to challenge whether the State had probable cause to forfeit its customers' funds'.").

Though Defendants attempt to frame their Article III standing argument in the context of a typical Western Union transaction, Plaintiffs' transactions with Western Union were not typical, as seizure warrants that Defendants obtained caused Plaintiffs' sent funds to be diverted into detention accounts. (PRSOF ¶¶ 28-31; 34-35.) That is why, for the purposes of injury, it is irrelevant whether Torres was sending money belonging to or owed to Vasquez. (PRSOF ¶¶ 39-41). In a typical transaction, Torres could have sought and obtained a refund of the money sent through Western Union at any time prior to Vasquez's receipt, and paid Vasquez in a different manner or at a different time. (PRSOF ¶ 28.) Such a remedy was not available here because Defendants obtained seizure warrants and subsequently detained Torres' sent funds. (PRSOF ¶ 34.) Given these facts, Defendants have failed to meet their burden to show that its actions did not cause Plaintiffs a "concrete and particularized" injury-in-fact for the purposes of Article III standing. Lujan, 504 U.S. at 560-61.

Second, Plaintiffs' alleged injury was fairly traceable to Defendants' alleged conduct. See Lujan, 504 U.S. at 560-61 ("[T]here must be a causal connection between the injury and the conduct complained of–the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'") (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)). The undisputed facts establish that the warrants Defendants obtained caused funds Plaintiffs sent to be diverted from their intended receiver and placed into a detention account. (PRSOF ¶¶ 34-35, 53.) Defendants' contention that they never obtained control of Rivadeneyra's funds do not diminish the fact that Defendants' alleged conduct caused the funds to be diverted. See Lujan, 504 U.S. at 560-61.

Third, Plaintiffs' alleged injury can likely be redressed through a favorable decision. See Lujan, 504 U.S. at 560-61. Plaintiffs' lawsuit seeks damages, restitution, declaratory relief, and injunctive relief. (Doc. 141 at 13.) Defendants argue that the Eleventh Amendment precludes recovery of damages in this case as to Rivadeneyra. (Doc. 196 at 16.) Generally, defendants named in their individual capacities pursuant to 42 U.S.C. § 1983 can be sued for money damages. Hafer v. Melo, 502 U.S. 21, 31 (1991); Suever v. Connell, 579 F.3d 1047, 1060-61 (9th Cir. 2009). Further, state officials sued either in their official or individual capacities are amenable to claims seeking injunctive relief. Hafer, 502 U.S. at 31. As Plaintiffs' Complaint names Defendant Horne in his official capacity, and Defendants Goddard and Holmes in their individual capacities, relief would likely be available in the event of a favorable decision for Plaintiffs.

**B.  Plaintiffs' Fourteenth Amendment Claim (Count III)**

Plaintiffs' Count III alleges that Defendants violated Plaintiffs' Fourteenth Amendment due process rights by failing to give adequate and timely notice of the seizure and forfeiture of funds. (Doc. 141 ¶¶ 49-53.) Defendants argue that Plaintiffs have failed to show an interest in the seized funds sufficient to demonstrate Article III standing for their Fourteenth Amendment claim, but do not cite any pertinent case law to support their

position.[5] (Doc. 213 at 12.) Though the undisputed facts establish that Defendants did not provide written notice of seizure to senders of the seized funds (PSOF ¶ 22; Doc. 51 at 6), the Court makes no finding on whether Defendants were constitutionally entitled to such notice. However, the Court does find on the same grounds that it did in Part I.A of this Order that Plaintiffs have Article III standing to bring their Fourteenth Amendment claim because they have alleged Defendants' actions caused harm related to the funds Plaintiffs sent that would likely be redressed by a favorable decision by the Court. See Lujan, 504 U.S. at 560-61.

**C.      Plaintiffs' Commerce Clause Claim (Count IV)**

Plaintiffs' Count IV alleges that Defendants' seizures constituted an unconstitutional interference with interstate or foreign commerce. (Doc. 141 ¶¶ 54-58.) Defendants contend that Plaintiffs lack standing to bring their Commerce Clause claim because they are unable to show an injury-in-fact or meet the prudential standing requirements of Article III. (Doc. 213 at 12.) The Court finds on the same grounds cited in Part I.A of this Order that Plaintiffs have alleged an injury as a result of Defendants' alleged conduct, which would likely be redressed by a decision in their favor. See Lujan, 504 U.S. at 560-61.

To satisfy the prudential component of Article III standing, Plaintiffs' "complaint must 'fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Individuals for Responsible Gov't, Inc. v. Washoe Cnty., 110 F.3d 699, 702-03 (9th Cir. 1997) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 475 (1982)). Here, the purpose of the dormant Commerce Clause is to limit the power of states to discriminate against interstate commerce. U.S. Const. Art. I, § 8. The dormant foreign Commerce Clause

---

[5]In two of the cases Defendants cite, the courts actually held that plaintiffs had Article III standing to bring their due process claims. (Doc. 213 at 11-12 (citing Waterfront Renaissance Assocs., 701 F. Supp. 2d at 640-41 (developer had standing to challenge building height restriction that would inhibit proposed project); Beary Landscaping, Inc. v. Ludwig, 479 F. Supp. 2d 857, 865-66 (N.D. Ill. 2007) (contractors had standing to challenge wage act to retain money on contracts completed)).)

1   serves to preserve federal uniformity in the arena of foreign commerce. <u>Wardair Can., Inc.</u>
2   <u>v. Fla. Dep't of Revenue</u>, 477 U.S. 1, 7-8 (1986).

3          In support of their argument that Plaintiffs lack prudential standing to make a
4   Commerce Clause claim, Defendants cite <u>City of Los Angeles v. County of Kern</u>, in which
5   California recyclers invoked the Commerce Clause to challenge Kern County, California's
6   restrictions on waste disposal because it would necessitate them dumping out-of-state. (Doc.
7   213 at 13 (<u>citing</u> 581 F.3d 841, 844, 847-48 (9th Cir. 2009)).) The Ninth Circuit found for
8   Kern County, holding that the Commerce Clause interest to be protected–preventing barriers
9   against interstate trade–was not implicated in a case in which recyclers merely sought to
10  dispose of their waste in-state. <u>Id.</u> at 847-48. The Court relied on <u>Washoe County</u>, in which
11  the Ninth Circuit held that Nevada residents lacked prudential standing to challenge an
12  ordinance requiring them to use a Nevada county's garbage collection services rather than
13  less expensive California services. 110 F.3d at 702-03. The Court in <u>Washoe County</u>
14  reasoned that the residents' injury would exist even if the Nevada county later disposed of
15  their garbage out-of-state. <u>Id.</u> at 703-04 ("Under those circumstances, the Washoe County
16  ordinance would impose no barrier to interstate commerce.").

17         Plaintiffs here allege that Defendants have burdened "interstate and international
18  commerce in favor of intra-state commerce within Arizona" by directing their seizures at
19  money transfers from out-of-state to Arizona and from the United States to Mexico. (Doc.
20  141 ¶¶ 54-58.) Defendants have obtained warrants resulting in the seizure of millions of
21  dollars from thousands of people sending money from out-of-state to Arizona and from the
22  United States to Mexico, including at least $920 from Torres and $500 from Rivadeneyra.
23  (PRSOF ¶¶ 6, 32, 35.) At least in relation to the money seized that could not be linked to
24  illegal activity (PSOF ¶¶ 17-18), Plaintiffs' complaint "'fall[s] within the zone of interests
25  to be protected or regulated by'" the dormant commerce clause, which seeks to limit the
26  power of states to discriminate against interstate commerce. <u>Washoe Cnty.</u>, 110 F.3d at 702-
27  03 (<u>quoting</u> <u>Valley Forge Christian Coll.</u>, 454 U.S. at 475; U.S. Const. Art. I, § 8. The
28  conduct alleged also falls within the purview of the dormant foreign Commerce Clause,

1    which serves to preserve uniformity in foreign commerce. <u>Wardair Can., Inc.</u>, 477 U.S. 1,

2    7-8 (1986). Therefore, Plaintiffs' allegations satisfy the "zone of interests" test such that they

3    have prudential standing satisfying Article III.

4    **II.      Defendants' Argument that Rivadeneyra's Claims Are Moot**

5          Defendants also seek summary judgment on grounds that Rivadeneyra's claims are

6    moot. (Doc. 196 at 15-16.) Article III limits federal jurisdiction to "actual, ongoing cases or

7    controversies." <u>Lewis v. Cont'l Bank Corp.</u>, 494 U.S. 472, 477 (1990). The federal courts do

8    not have jurisdiction "to decide moot questions or abstract propositions," because "'moot

9    questions require no answer.'" <u>North Carolina v. Rice</u>, 404 U.S. 244, 246 (1971) (<u>quoting</u>

10   <u>Mo., Kan. & Tex. Ry. Co. v. Ferris</u>, 179 U.S. 602, 606 (1900)). A case or controversy must

11   exist at all times, not simply at the time that the lawsuit was filed. <u>Alvarez v. Smith</u>, 130 S.Ct.

12   576, 580 (2009). "When the issues presented are no longer 'live' or the parties lack a legally

13   cognizable interest in the outcome," a case becomes moot. <u>Porter v. Jones</u>, 319 F.3d 483, 489

14   (9th Cir. 2003) (<u>quoting</u> <u>Clark v. City of Lakewood</u>, 259 F.3d 996, 1011 (9th Cir. 2001)).

15         Defendants contend that Rivadeneyra's claims for damages and injunctive and

16   declaratory relief are moot because her funds were always in the possession of Western

17   Union–a result of Western Union's state court proceedings against the State of Arizona–and

18   are now available for refund, eliminating any controversy in this case.  (Doc. 196 at 15-16

19   (<u>citing</u> <u>Alvarez</u>, 130 S. Ct. at 580-81 (forfeiture case declared moot where seized property

20   was returned and plaintiffs sought "only declaratory and injunctive relief, not damages"))); 

21   (PRSOF ¶¶ 54-55.) Plaintiffs respond that even if Defendants lacked possession of

22   Rivadeneyra's seized funds, it was Defendants' warrants that caused the funds to be seized,

23   creating liability. (Doc. 201 at 17.) Further, Plaintiffs allege that injunctive relief is

24   appropriate in this case because the alleged constitutional violations are likely to recur. (Doc.

25   201 at 15-16.)

26         The Court finds that Rivadeneyra's claims are not moot, and that Defendants' reliance

27   on <u>Alvarez</u> is misplaced. First, Rivadeneyra has sought damages, rather than merely the

28   declaratory and injunctive relief that the Supreme Court based its decision on in <u>Alvarez</u>. 130

1    S. Ct. at 580. Second, in contrast to the parties in <u>Alvarez</u>, Rivadeneyra has not reached any

2    settlement related to the disposition of the money seized. <u>Id.</u> at 578. Even if Rivadeneyra has

3    not made a valid claim for injunctive or declaratory relief–a finding that the Court does not

4    make here[6]–Rivadeneyra's request for restitution and damages provides this case with a

5    continuing controversy that prevents a finding of mootness. <u>See</u> <u>Memphis Light, Gas and</u>

6    <u>Water Div. v. Craft</u>, 436 U.S. 1, 8 (1978) (claim for damages saves case from mootness).

7                                    **CONCLUSION**

8          The Court makes no finding as to Plaintiffs' chance of success in this lawsuit.

9    However, the Court does find that Defendants in their Motion for Summary Judgment on All

10   Claims (Re: Standing) (Doc. 196) have failed to meet their burden to demonstrate that they

11   are entitled to summary judgment on Plaintiffs' claims as a matter of law. Fed. R. Civ. P. 56.

12         **IT IS HEREBY ORDERED DENYING** Defendants' Motion for Summary

13   Judgment on All Claims (Re: Standing) (Doc. 196).

14         **IT IS FURTHER ORDERED** that the parties have until **Friday, May 13, 2011** to

15   conduct discovery in accordance with the Court's earlier order (Doc. 190).

16         DATED this 10th day of February, 2011.

17

18

19                                    Stephen M. McNamee
                                      United States District Judge

20

21

22

23   _____

24         [6]Rivadeneyra has asserted a desire to send funds through Western Union if her funds
     were not seized. (Doc. 141 at 13; PSOF ¶ 39.) Given Defendants' prior seizure of

25   Rivadeneyra's sent funds, there exists a credible chance that similar future warrants would
     result in a similar seizure. <u>See</u> <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 n.3 (1983); <u>LaDuke</u>

26   <u>v. Nelson</u>, 762 F.2d 1318, 1324 (9th Cir. 1985). Though Defendants state that they have "no
     plans" to pursue similar seizures in the future (Doc. 213 at 15), such a voluntary cessation

27   does not prevent the Court from determining the legality of Defendants' practices. <u>See</u>

28   <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 189 (2000).