**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Javier Torres, Lia Rivandeneyra,

Plaintiffs,

vs.

Thomas Horne, Attorney General of
the State of Arizona, in his individual
and official capacities, et al.,

Defendants.

No. CV-06-2482-PHX-SMM

**MEMORANDUM OF DECISION
AND ORDER**

Plaintiffs Javier Torres and Lia Rivadeneyra (collectively "Plaintiffs") are customers of Western Union Financial Services, Inc. ("Western Union") whose money transfers were subject to seizure warrants issued by the Maricopa County Superior Court. Plaintiffs allege that their money transfers were seized without probable cause, that due process notice of the seizures was not provided, and that these seizures violated the Commerce Clause. (Doc. 80 at 5.) Pending before the Court is Plaintiffs' Motion for Summary Judgment on the merits of their claims. (Doc. 229.) Also pending is former Attorney General Terry Goddard and Assistant Attorney General Cameron Holmes (collectively "Defendants") Cross-Motion for Summary Judgment contending that they are entitled to absolute and qualified immunity, as well as summary judgment on the merits of the claims. (Doc. 240.) Because absolute immunity is an issue to be resolved before the merits, see Imbler v. Pachtman, 424 U.S. 409, 419 n.13 (1976), the Court will first direct its attention to this issue. After careful consideration of the parties' arguments, the Court finds that Defendants are entitled to

absolute immunity and, therefore, will grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

## FACTUAL BACKGROUND

The general background of this case has been discussed in litigation occurring in both state and federal court.  See W. Union v. Goddard, No. CV 06-2249-PHX-SMM (federal court); State of Arizona v. W. Union Fin. Servs., Inc., 216 Ariz. 361, 166 P.3d 916 (App. 2007); State v. W. Union Fin. Servs., Inc., 220 Ariz. 567, 208 P.3d 218 (2009) vacating 219 Ariz. 337, 199 P.3d 592 (App. 2008) (state court).  In State of Arizona v. W. Union Fin. Servs., Inc., 216 Ariz. 361, 166 P.3d 916 (App. 2007), the Arizona Court of Appeals provided a background summary that is helpful to an understanding of the setting in which this case arose:

> [Daniel Kelly, a financial crimes investigator with the Arizona Department of Public Safety] testifies that smugglers (referred to as "coyotes") of undocumented immigrants ("UDIs") are typically paid for their racketeering activity after they have successfully transported their human cargo into Arizona. The coyotes are paid by "sponsors" who typically reside in states, referred to as "corridor states," to which UDIs are frequently transported when they leave Arizona. In the early years of this decade, the coyote, upon successful transport of the UDI to Arizona, would contact the UDI's sponsor and request that the sponsor wire funds to the coyote in Arizona before the UDI was placed in transit to his destination from Arizona.

> Despite the use of various strategies by the coyotes' pick-up agents to avoid detection when collecting wire-transfer payments, law-enforcement officers were able to identify and locate Western Union agents frequently used by traffickers due primarily to the high volume of business that began to occur with those agents. Once identified in this manner, further analysis permitted the identification of patterns associated with wire-transfer activity associated with racketeering and the identification of pick-up agents.

> Kelly asserts that due to law enforcement's success at identifying and seizing wire-transfer transactions sent to Arizona, traffickers drastically reduced the number of wire-transfer payments into the state. Instead, illegal traffickers began directing that the payments for their activities be sent to pick-up agents in Sonora rather than Arizona.  Kelly backs up these assertions by presenting his analysis of data voluntarily provided by Western Union that shows all of the wire-transfers to Sonora for the months of March and April 2005. Based on his analysis, Kelly determined that a disproportionate number of the financial transfers being sent to Sonora were sent to Western Union agents located in five cities along the Arizona border. These cities include Caborca, Altar, Nogales, Agua Prieta, and San Luis Rio Colorado.  All of these cities are well known to law enforcement as staging areas for smugglers, particularly human smugglers.

<u>Western Union</u>, 216 Ariz. at 363-64, 166 P.3d at 918-19.

Regarding this case, the Court has previously set forth the basic facts. (<u>See</u> Docs. 183, 216.) In addition, the parties have also stipulated to certain facts. (Doc. 231-8 at 48-71.) Since at least October 2000, law enforcement personnel in Arizona have been assigned to a special Arizona Financial Crimes Task Force (the "Task Force"). (Doc. 231-8 at 49-50.) The Task Force has included Arizona Department of Public Safety personnel, employees of the Arizona Attorney General's Office and detectives from the City of Phoenix Police Department. (<u>Id.</u>) An objective of the Task Force was to identify and implement strategies to interrupt the flow of narcotics and alien smuggling proceeds flowing to and through Arizona. (<u>Id.</u>) The Task Force specialized in the investigation of money laundering through commercial money remitters, such as Western Union. (Doc. 250 at 2.)

The Task Force members engaged in a progressive investigation over several years that included, among other law enforcement actions, over 20 seizure warrants authorized by judges of the Maricopa County Superior Court. (Doc. 231-8 at 50.) Some of the seizure warrants authorized seizure for forfeiture of Western Union money transfers. (<u>Id.</u>) During the earliest stages of the Task Force's financial investigations in 2000, law enforcement personnel became aware of a flow of tens of millions of dollars per month in the form of Western Union money transfers paid out in cash at small Phoenix area Western Union agent locations. (<u>Id.</u>) Follow up analysis and investigation confirmed the connection of monies being distributed through Western Union money transfer transactions with illegal activity. (<u>Id.</u>)

*Investigation and Initiation of In Rem Proceedings*

Relevant to the time period of this lawsuit, Defendant Goddard was Attorney General of Arizona starting in January 2003. During the time period from 2000 to 2007, Defendant Holmes was an Assistant Attorney General in the Arizona Attorney General's Office. Holmes supervised the Financial Remedies Section within the Criminal Division of the Attorney General's Office. Holmes' caseload consisted of civil forfeiture and civil

racketeering lawsuits.  (Doc. 250 at 4.)  In connection with the seizure warrants at issue in this case and the subsequent forfeiture proceedings involving the electronic money transfers, Defendant Holmes acted as the "attorney for the state" within the meaning of A.R.S. § 13-4301(1) (2006).  (Doc. 237 at 25.)

Based upon the investigation of the Task Force, Task Force agents continued to seek seizure warrants.  In regard to each seizure warrant, the criteria that would be used to specify which money transfers would be seized was decided on by the Task Force agents.  (Doc. 237 at 26.)  Neither Defendant Holmes nor Defendant Goddard made the decision as to what criteria for seizure would be used in the seizure warrant.  (Id.)  Each application for a seizure warrant was based upon detailed warrant affidavits which described the evidence supporting probable cause for seizure for forfeiture of the targeted money transfer transactions.  (Doc. 237 at 18.)  Task Force agents were responsible to prepare comprehensive affidavits which were then submitted for review to Defendant Holmes.  (Id.)  Arizona Department of Public Safety Detectives Tod Kleinman and George Gregor prepared the affidavits in support of the Sweep 18 seizure warrant.  (Doc. 109, Ex. 5 & 6.)  Kleinman was the sole affiant on the Sweep 21 seizure warrant affidavit.  (Id.)

As the attorney for the State in connection with the seizure warrant affidavits submitted by the Task Force agents, Defendant Holmes indicated that he always reviewed the seizure warrant affidavit in order to satisfy himself that the seizure warrant being applied for was supported by probable cause.  (Doc. 237 at 25.)  Holmes also indicated that he supervised the preparation of the application for seizure warrants and its attachments, i.e., the affidavits in support of the seizure warrant and the proposed seizure warrant itself.  (Id.; Doc. 231-8 at 58-71.)

After Holmes' review, the application for seizure warrant and its attachments–the supporting warrant affidavits and the proposed seizure warrant–would be taken to court and filed, numbered with a court number, and presented to a judge by the law enforcement officers who were the affiants on the supporting warrant affidavits.  (Doc. 237 at 26.)

After the superior court considered and in this case issued the seizure warrants, Holmes "accomplished formal service of the warrants [commanding seizure of Plaintiffs' funds] on Western Union." (Id.)

*Issuance of Seizure Warrants*

The two warrants at issue in this case were issued by the Maricopa County Superior Court and then served by" Defendants on Western Union on March 15, 2006 ("Sweep 18"), and September 21, 2006 ("Sweep 21"). (Doc. 80, Ex. E & F.) Both of these warrants shared certain characteristics, including requiring the seizure of (1) person-to-person transactions, (2) sent from areas outside Arizona, (3) for delivery in Arizona (or in one warrant, Sonora, Mexico), (4) in any amount at or exceeding a threshold level, (5) during the time period the warrant was in effect.

Regarding Sweeps 18 and 21, Defendant Holmes served Western Union with letters, Seizure Warrant no. SW2006-02054, and Seizure Warrant no. (SW2006-002213. (Doc. 231-8 at 57-71.)

March 15, 2006 Warrant (SW2006-002054 – Sweep 18): This warrant seized all person-to-person money transfers of $500 or more placed with Western Union in any of the following states: Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, New Jersey, New York, North Carolina, South Carolina, and Virginia. (Doc. 80, Ex. E.) The transfers were intended to be paid in Arizona starting on March 17, 2006. The warrant later was extended through April 14, 2006 (Doc. 80, Ex. E1.)

September 21, 2006 Warrant (SW2006-002213 – Sweep 21): This warrant seized all person-to-person money transfers of $500 or more placed with Western Union in any of 29 states: California, Arizona, New York, Florida, Illinois, Georgia, New Jersey, North Carolina, Virginia, Tennessee, Maryland, Texas, Nevada, South Carolina, Ohio, Pennsylvania, Washington, Alabama, Indiana, Oregon, Colorado, Minnesota, Utah, Connecticut, Michigan, Massachusetts, Wisconsin, Kentucky, and Delaware (Doc. 80, Ex. F.) The transfers were intended to be paid at one of 26 locations in Sonora, Mexico. (Id.)

These seizure warrants contained criteria for transactions that would be seized that were met by Western Union transactions initiated by the two named Plaintiffs, Javier Torres and Lia Rivadeneyra. (Doc. 231-8 at 50.)

*Seizure of Western Union Money Transfers*

Western Union's primary business is person-to-person wire money transfers conducted

throughout the United States and in over 195 foreign countries.  A customer initiates a transfer by visiting a Western Union location and completing a "send" form.  (Doc. 80, Ex. G at 8.)   The sender then provides the Western Union agent with the necessary documentation and pays the agent the amount to be transferred along with a service fee.  (Id.) The agent then enters the information into Western Union's computer system which assigns a unique Money Transfer Control Number ("MTCN") to the transaction.  (Id.) This MTCN is provided to the sender to give to the intended recipient of the funds.  (Id.)  The transaction information is stored by Western Union at a data processing center until the funds are called for payment.  (Id.)  To receive the funds, the intended recipient completes a "receive money" form and presents it, together with the MTCN and proper identification, at a Western Union payout location.   (Id. at 10-11.)   After confirming this information, the agent pays the recipient the amount of money transferred by the sender.  (Id.)  The sender can cancel the transaction and receive a refund up until the money is paid to the receiver.  (Id. at 10.)

Plaintiffs Torres and Rivadeneyra initiated the transfers at issue in this case by appearing in person at a Western Union agent location and completing the paperwork required by Western Union. (Doc. 231-8 at 53.) This normal payout process, however, was interrupted by Defendants' service on Western Union of the seizure warrants at issue here. When the warrant was served, Western Union was required to "hold" all customers' wire transfer transactions meeting the warrant criteria and then pay the funds from the transactions into a detention account. (Doc. 80, Ex. F at 3, ¶ 4.) From the detention account, the seized funds were next transferred to an account of the Clerk of the Superior Court of the State of Arizona, Maricopa County where the funds were subject to forfeiture. (Id.)

During the effective dates of the warrant, the seizing agency, the Arizona Department of Public Safety, provided "on-call representatives" who were available by phone to speak with senders and receivers regarding the seizure of their funds. (Doc. 250 at 18.) The Attorney General's office had no role in supervising the call center. (Id. at 19.) Defendant Holmes was never present at the call center and did not train, direct or control the call center

representatives.  (Id.)  After questioning the sender or receiver about the transaction, the representative determined whether to allow the transaction to be completed.  (Id. at 18.)  If no one called regarding a seized transfer or the person calling failed to show that the seized transfer was for a legal purpose, the seized transfer was forfeited.  (Doc. 237 at 26-27.)  In each instance, forfeiture was sought as to all of the electronic money transfers that had been seized pursuant to the seizure warrant, except for transfers that were released from seizure subsequent to execution of the warrant.  (Doc. 237 at 26-27; Doc. 250 at 15.)  After notice of pending forfeiture was sent to the intended recipients of the money, forfeiture proceedings were held.  (Doc. 80, Ex. I, Kelly Aff.)  In Sweep 21, the State of Arizona never gained possession of the funds Rivadeneyra sent. (Doc. 216 at 5; Doc. 237 at 23-24.)

In September 2006, Western Union filed a lawsuit in Maricopa County Superior Court pertaining to the Sonora warrant, and obtained a preliminary injunction that prevented Western Union from having to transfer Sonora warrant funds to the Maricopa County Superior Court Clerk for forfeiture proceedings. Western Union, 220 Ariz. at 569, 208 P.3d at 220.  The Arizona Court of Appeals vacated the superior court's order.  Id.  Ultimately, the Arizona Supreme Court reversed and remanded to the superior court concluding that the superior court could not exercise *in rem* jurisdiction over Western Union money transfers from senders in other states other than Arizona to recipients in Mexico.  Id. at 576, 208 P.3d at 227.  In February 2010, the State of Arizona and Western Union reached a settlement, which in part allowed Western Union to release funds seized pursuant to the Sonora warrant. (Doc. 216 at 5.)  Under the settlement, Defendant Holmes has stated that senders whose funds were seized were eligible for a refund from Western Union. (Doc. 197, Ex. 8 ¶¶ 6-7.)

**PROCEDURAL BACKGROUND**

Plaintiffs' Complaint alleges that (1) Defendants seized money from them in violation of the Fourth Amendment based on warrants that were not properly supported by probable cause; (2) the seizure warrants were overly broad on their face in violation of the Fourth Amendment; (3) Defendants caused the seizure and forfeiture of Plaintiff Torres's money

without providing him timely and adequate notice as well as failed to provide a prompt post-seizure hearing to contest the seizures, all in violation of Fourteenth Amendment Due Process; and (4) Defendants interfered improperly with interstate and international commerce in violation of the Commerce Clause. (Doc. 1.) Plaintiffs' Complaint was subsequently amended twice, but the substantive claims remained the same (Doc. 47, 141).

Subsequently, Plaintiffs filed a Motion for Class Certification. (Doc. 79.) Under Federal Rule of Civil Procedure 23, Plaintiffs sought to represent both themselves as well as a class of others senders whose funds were subjected to these seizures during the applicable limitations period. (Doc. 80.) On February 25, 2009, the Court held a hearing to "take evidence from a limited number of relevant law enforcement officials concerning the facts supporting the belief that seized transactions were involved in criminal activity" and other evidence that related to class certification requirements. (Doc. 92 at 17; Docs. 160, 162.) Following the full-day hearing and additional briefing to aid the Court, the Court denied Plaintiffs' motion for class certification. (Doc. 183.) The Ninth Circuit Court of Appeals denied Plaintiffs' permission to immediately appeal the Court's interlocutory ruling. (Doc. 184.)

Defendants then challenged Plaintiffs' Article III standing to litigate this matter, which the Court denied. (Doc. 216.) On January 11, 2011, Tom Horne was substituted for that of Terry Goddard, in his official capacity as the Attorney General of Arizona. (Doc. 215.) Now pending are Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment. (Docs . 229, 240.)

## STANDARD OF REVIEW

*Summary Judgment*

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994).  Substantive law determines which facts are material.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson, 477 U.S. at 248.  The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims."  Celotex, 477 U.S. at 323-24.  Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).  The moving party need not disprove matters on which the opponent has the burden of proof at trial.  See Celotex, 477 U.S. at 323-24.  The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment."  Id. at 324.  However, the nonmovant "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-88 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995).

*Absolute Immunity*

"The proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity."  Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432 (1993); see also Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993); Ewing v. City of Stockton, 588 F.3d 1218, 1234 (9th Cir. 2009).

State officials are absolutely immune from § 1983 suits if they perform "'special functions' which, because of their similarity to functions that would have been immune when

Congress enacted § 1983, deserve absolute protection from damages liability." Buckley, 509 U.S. at 268–69 (quoting Butz v. Economou, 438 U.S. 478, 508 (1978)).  It is the "nature of the function performed, not the identity of the actor who performed it," that determines whether an official is cloaked by absolute immunity. Buckley, 509 U.S. at 269.

Absolute immunity is accorded to officials of government agencies "performing certain functions analogous to those of a prosecutor" or a judge. Butz, 438 U.S. at 515; see also Tamas v. Dep't of Soc. & Health Servs., 630 F.3d 833, 842 (9th Cir. 2010) (stating that absolute immunity protects state officials when they are performing quasi-prosecutorial and quasi-judicial functions).  The protections of absolute immunity reflect the dual concerns that harassment by unfounded litigation would cause a deflection of the government official's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust. See Butz, 438 U.S. at 515; Olsen v. Idaho State Bd. of Med., 363 F.3d 916, 923 (9th Cir. 2004).  The Supreme Court has described the functions analogous to those of a prosecutor or a judge, as those "intimately associated with the judicial phase of the criminal process."  Imbler, 424 U.S. at 430; see also Olsen, 363 F.3d at 923.

However, state officials are only granted qualified immunity, if they are performing investigatory or administrative functions, or essentially functioning as a police officer or detective.  See Buckley, 509 U.S. at 273.  Functions such as evidence gathering and witness interviews are normally performed by a detective or police officer.  See Cousins v. Lockyer, 568 F.3d 1063, 1068 (9th Cir. 2009).  When determining whether a particular action qualifies for immunity, the court looks at "the nature of the function performed, not the identity of the actor who performed it."  Kalina v. Fletcher, 522 U.S. 118, 127 (1997) (further quotation omitted).  "[I]mmunity is justified . . . by the functions it protects and serves, not by the person to whom it attaches."  Forrester v. White, 484 U.S. 219, 227 (1988).

///

///

**DISCUSSION**

*Absolute Immunity–Holmes*

Defendants contend that Holmes' conduct in this case was intimately associated with the judicial phase and therefore he is entitled to absolute immunity.  (Doc. 240 at 11.) Specifically, Defendants point to Holmes' conduct with regard to his pursuit of seizure warrants in an *in rem* proceeding and subsequent forfeiture proceedings. (Id.)  Because it is the conduct of the state official that determines whether he is entitled to absolute immunity, the Court will review both the conduct of the Defendants and the legal context in which that conduct arose.

It is a longstanding rule that seizure of the property, the *res*, is a necessary first step for a trial court to have *in rem* jurisdiction in a forfeiture action.  See State v. One Single Family Residence at 1810 East Second Avenue, Flagstaff, Arizona, 193 Ariz. 1, 969 P.2d 166 (App. 1997); see also Rebublic Nat'l Bank of Miami v. United States, 506 U.S. 80, 84 (1992) (reiterating the general rule that seizure is a prerequisite to the court's jurisdiction in an *in rem* civil forfeiture proceeding).  Unless the state takes the first affirmative step of seizing the *res*, it has not acquired *in rem* jurisdiction over the property.  Residence at 1810 East Second Avenue, Flagstaff, Arizona, 193 Ariz. at 3, 4, 969 P.2d at 168, 169 ("To hold otherwise would lead to the absurd result that the superior court currently has jurisdiction over all property in the state and that the state need only file a forfeiture complaint to seize and forfeit the property.")  Absent jurisdiction over the property, any judgment issued by the court is void.  Id. at 8, 969 P.2d at 173 (vacating the judgment against the residence for lack of jurisdiction).

In this case, based upon a showing the Maricopa County Superior Court believed established probable cause that the property was subject to forfeiture, the issuance of a seizure warrant was the mechanism utilized by the court to authorize the seizure of designated property. See A.R.S §§ 13-4304 (discussing property that is subject to forfeiture); 13-4305(A)(1) & 13-4310(A) (seizure for forfeiture pursuant to warrant authorized).

Pursuant to the warrants, the superior court acquired *in rem* jurisdiction over the property at the time of seizure, which gave it the power to adjudicate the disposition of the property, including the issue of whether the property would be forfeited.  See Residence at 1810 East Second Avenue, Flagstaff, Arizona, 193 Ariz. at 3, 969 P.2d at 168; (Doc. 237 at 25).

In connection with the seizure warrants and the subsequent forfeiture proceedings involving the electronic money transfers, Defendant Homes acted as attorney for the state pursuant to A.R.S. § 13-4301(1) (2006).  (See Doc. 231-8 at 58-71.)  As the attorney for the state in connection with the seizure warrants, Defendant Holmes indicated that he always reviewed the seizure warrant affidavit in order to satisfy himself that the seizure warrant being applied for by the law enforcement officers was supported by probable cause.  (Doc. 237 at 25.)  Holmes also indicated that he supervised the preparation of the application for seizure warrant and its attachments, i.e., the affidavits in support of the seizure warrant and the proposed seizure warrant itself.  (Id.)

After Holmes' review, the application for seizure warrant and its attachments, the supporting warrant affidavits and the proposed seizure warrant, were taken to court and filed, numbered with a court number, and presented to a judge by the law enforcement officers who were the affiants on the supporting warrant affidavits.  (Doc. 237 at 26.)

After the superior court considered and, in this case issued the seizure warrants, Holmes "accomplished formal service of the warrants [commanding seizure of Plaintiffs' funds] on Western Union."  (Id.; Doc. 231-8 at 57-71.)

As attorney for the state, Defendant Holmes handled the forfeiture proceedings involving the funds derived from the electronic money transfers seized pursuant to the seizure warrants in Sweeps 18 and 21.  (Doc. 237 at 26-27).  Defendant Holmes sought forfeiture as to all of the electronic money transfers seized pursuant to the seizure warrants, except for transfers that had been released from seizure subsequent to execution of the warrant, pursuant to A.R.S. § 13-4306(A) (2006).  (Doc. 237 at 26-27).

As attorney for the state, Defendant Holmes' made the decision to whom the State

would send notice of pending forfeiture in connection with the seized electronic money transfers.  (Doc. 237 at 27.)  In regard to most of the money transfers seized pursuant to the Task Force's seizure warrants, including those seized in Sweeps 18 and 21, Holmes decided that the State would provide notice of pending forfeiture to the persons who were the intended recipients of the money transfer transactions.  (Id.)

In general, government attorneys are absolutely immune from liability under 42 U.S.C. § 1983 for acts involving or related to litigation.  Fry v. Melaragno, 939 F.2d 832, 837 (9th Cir. 1991).  In Butz v. Economou, 438 U.S. 478, 515 (1978), the Supreme Court held that immunity from § 1983 damage suits should be provided not only to prosecutors, but also to government attorneys involved in civil administrative proceedings.  The Court found that government attorneys were entitled to absolute immunity both for the decision to initiate administrative enforcement proceedings and for their activities in litigating enforcement actions.  (Id., "The discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted if their immunity from damages arising from that decision was less than complete.").  The Butz Court went on to note that absent immunity there would be a serious danger that the decision to authorize proceedings may provoke a retaliatory response, wherein a targeted individual may react angrily and seek vengeance in the courts.  Id.[1]

In Schrob v. Catterson, 948 F.2d 1402 (3d Cir. 1991), the Third Circuit considered the issue facing this Court, namely whether an attorney is entitled to absolute immunity when he initiates an *in rem* seizure proceeding pursuant to a seizure warrant. An Assistant United States Attorney ("AUSA") initiated an *in rem* seizure and forfeiture action against corporate stock and property of the plaintiff's business. Upon the filing of a § 1983 suit, the AUSA

---

[1]Correspondingly, the Ninth Circuit Court of Appeals has repeatedly held that government attorneys who initiate or handle civil litigation are generally immune from liability for damages claims arising from their activities. See, e.g., Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001); Fry v. Melaragno, 939 F.2d 832, 836-37 (9th Cir. 1991); Demery v. Kupperman, 735 F.2d 1139, 1143-44 (9th Cir. 1984); Flood v. Harrington, 532 F.2d 1248, 1250-51 (9th Cir. 1976).

asserted absolute immunity. In response, the plaintiff argued that the seizure of the business property for forfeiture was an "investigative" act similar to the execution of a search warrant, and therefore was not the sort of litigation-related activity entitled to absolute immunity. The Third Circuit concluded that the AUSA's actions were covered by absolute immunity, and dismissed the lawsuit. Id. at 1422. The court discussed immunity in the context of the *in rem* proceeding, as follows:

> . . . The property sought under the seizure warrant is considered tainted upon the commission of the wrongful act and the government's interest in the property vests at the time of the act. See 21 U.S.C.A. § 881(h). **The prosecutor is not gathering evidence under a seizure warrant**, but has already decided to bring an action for forfeiture against the guilty property. Thus, a seizure warrant is a necessary first step in the statutory forfeiture process. The *in rem* complaint and the seizure warrant are intimately connected – one follows the other and effectuates it.

948 F.2d at 1416 (emphasis added).

In support of its holding that the government official was entitled to absolute immunity, the Schrob court also discussed the similarity between an *in rem* seizure warrant and an arrest warrant. Id. The seizure warrant "arrests" the property that is the subject of the forfeiture action. Id. Similarly, the prosecutor's act of seeking a warrant for the arrest of a defendant against whom he had filed charges is part of his initiation of the prosecution protected under Imbler, 424 U.S. at 431. Accord Waggy v. Spokane Cnty. Wash., 594 F.3d 707, 712 (9th Cir. 2010) (finding absolute immunity for prosecutor seeking bench warrant for arrest). In the same way that the arrest warrant ensures that the defendant is available for trial, and if found guilty for punishment, the seizure warrant is necessary to assure the availability of property subject to forfeiture and the warrant effectuates the arrest of the property. Schrob, 948 F.2d at 1416.

To the same effect is Ehrlich v. Giuliani, 910 F.2d 1220, 1222 (4th Cir. 1990) (granting absolute immunity, after analogizing the seizure of property to a prosecutor's act of seeking an arrest warrant). The Ehrlich court found that pursuing a seizure warrant was more than investigative activity: "One of the most important duties of a prosecutor pursuing a criminal proceeding is to ensure that defendants, or in this case the assets, are present at trial." Id. at

1223; Cf. United States v. $8,850 in U.S. Currency, 461 U.S. 555, 564 (1983) (stating that like an arrest warrant, a seizure warrant is necessary to assure the availability of property subject to forfeiture and the warrant effectuates the arrest of the property).

In addition to finding that Defendant Holmes' seeking the seizure warrant was not mere investigative activity, the Court further finds that the Butz rationale is also applicable to the absolute immunity question at issue here. The Butz Court noted that absent absolute immunity there would be a serious danger that the government official's decision to authorize proceedings may provoke a retaliatory response, wherein a targeted individual may react angrily and seek vengeance in the courts. 438 U.S. at 515. Given the potential for such a retaliatory response, the Supreme Court also noted that this may effect the manner in which the public official carries out his duties and the independent judgment that must be exercised as required by the public trust. Id. Consequently, the Court concluded that provision of absolute immunity was necessary. Id. at 516.

The Court agrees with this reasoning and rationale. Under the facts of this case, the initiation of an action against property pursuant to a seizure warrant may very well provoke a retaliatory response absent absolute immunity. Therefore, the Court finds that Defendant Holmes has carried his burden of establishing his justification to absolute immunity. See Id.

*Plaintiffs' Objections*

Plaintiffs contend that Defendant Holmes is not entitled to absolute immunity because (1) Holmes' conduct–reviewing charging documents before filing them with the applicable court–is commonly performed by police officers; (2) Holmes' filing of the seizure warrant preceded the filing of a charging document, the complaint for forfeiture; and (3) it was far from apparent that Defendant Holmes would file a forfeiture complaint when he filed the seizure warrant. (Doc. 253.)

*Reviewing Charging Documents*

Plaintiffs argue that Defendant Holmes is not entitled to absolute immunity because his review of charging documents and application to the court for the seizure warrant is an

investigative function that can be performed by police officers.  (Doc. 253 at 8-10.)

It is true that while "the distinction between the roles of 'prosecutor' and 'investigator' [or administrator] is not always clear," investigatory acts are normally done by police officials.  Waggy, 594 F.3d at 711; Genzler v. Longanbach, 410 F.3d 630, 638 (9th Cir. 2005).  Functions involving evidence gathering and witness interviews are functions that are normally performed by a detective or police officer.  See Cousins, 568 F.3d at 1068.

However, Holmes' initiation of an *in rem* proceeding by the preparation and filing of a seizure warrant is not mere investigative activity in this case.  In comparing Holmes' functions to the functions of a prosecutor, the dividing line that separates "investigative" activities from "judicial phase" activities has been identified as the point at which a prosecution is actually initiated, either by means of a grand jury indictment or the filing of charges by the prosecutor.  See Schrob, 948 F.2d at 1410-11.  Therefore, a prosecutor's actions in preparing and filing charging documents–including arrest warrants–are recognized as activities protected by absolute immunity.  See Kalina, 522 U.S. at 129; see also Cooper v. Parrish, 203 F.3d 937, 948 (6th Cir. 2000).

Furthermore, Arizona's statutes clearly provide that commencement of forfeiture proceedings is accomplished through the attorney for the state, which "means a lawyer designated by the Attorney General, by a county attorney or by a city attorney to prosecute forfeiture actions.   See A.R.S. § 13-4301(1) (2006).   Section 13-4308, entitled "Commencement of proceedings," provides in subsection A, in pertinent part that:

> The attorney for the state shall determine whether it is probable that the property is subject to forfeiture and, if so, may cause the initiation of uncontested or judicial proceedings against the property.

A.R.S. § 13-4308(A) (2006).  Moreover, § 13-4310(A), directly addresses the issuance of seizure warrants, and provides in relevant part that:

> In any proceeding pursuant to this chapter, the court, on application of the state, may enter any restraining order or injunction, . . . or take any other action to seize, secure, maintain or preserve the availability of property subject to forfeiture under this title, including a warrant for its seizure, whether prior or subsequent to the filing of a notice of pending forfeiture, complaint, indictment or information.

A.R.S. §§ 13-4310(A) (2006).  Thus, these statutory provisions establish that a seizure warrant can only be issued in the context of a judicial proceeding for forfeiture.  Such proceedings are be commenced by the attorney for the state, and a seizure warrant can only be issued "on application of the state."  Plaintiffs' assertion that "a seizure warrant for forfeiture must be obtained by a peace officer" is in error.  (See Doc. 253 at 9.)  The role of a police officer regarding seizure warrants for *in rem* proceedings is to provide factual information by affidavit, not to apply to the court for its issuance.

*Seizure Warrant is not a Charging Document*

Next, Plaintiffs argue that Holmes' filing of the seizure warrant was more like a search warrant and thus investigative activity because it preceded the filing of a charging document, which was the complaint for forfeiture.  (Doc. 253 at 6-8.)

The Court has already discussed and rejected this argument when it reviewed the requirements in Arizona for bringing an *in rem* civil forfeiture action.  In Residence at 1810 East Second Avenue, Flagstaff, Arizona, 193 Ariz. at 3, 4, 969 P.2d at 168, 169, the court made it abundantly clear that seizure of the property, the *res*, is a necessary first step for the trial court to obtain *in rem* jurisdiction over the property in a forfeiture action.  Arizona's forfeiture statutes permit property to be "charged" and "seized" pursuant to judicial process before the forfeiture suit is begun with the filing of notice of pending forfeiture.  See A.R.S. § 13-4310(A).  The Court has found that Holmes' filing a seizure warrant is "prosecutorial" not "investigative" activity because it is a necessary part of initiating the *in rem* proceedings. Schrob, 948 F.2d at 1416.  In the same way that an arrest warrant ensures that the defendant is available for trial, and if found guilty for punishment, the seizure warrant is necessary to ensure the availability of property subject to forfeiture and the warrant effectuates the arrest of the property.  Id.  Therefore, Holmes' filing of the seizure warrant is "intimately associated with the judicial phase" of a forfeiture action.

*Timing of the Forfeiture Complaint*

Contingent upon Plaintiffs' previous argument that the filing of a seizure warrant is not

a charging document, Plaintiffs' argue that it was never clear that Defendant Holmes would file a forfeiture complaint. As Plaintiffs' argument goes, since the forfeiture complaint is the document that initiates *in rem* proceedings, if Defendant Holmes did not file a forfeiture complaint, then *in rem* proceedings were never commenced and Holmes is not entitled to absolute immunity.

As previously discussed, the Court has already rejected these arguments. Because a seizure warrant commences *in rem* proceedings, the actual timing of the filing of the subsequent forfeiture complaint is not relevant to whether *in rem* proceedings have been commenced. This Court has already found Defendant Holmes' presentation and execution of a seizure warrant is "charging" activity, which entitles him to absolute immunity.

Moreover, Arizona's forfeiture statutes permit property to be "charged" and seized pursuant to judicial process before the forfeiture suit is begun with the filing of notice of pending forfeiture. Arizona statutes allow seizure of property pursuant to a seizure warrant either before or after the filing of notice of pending forfeiture. See A.R.S. § 13-4310(A) (2006). If seizure for forfeiture takes place before notice of pending forfeiture is filed, the state is required to proceed with filing the notice of pending forfeiture within sixty days after seizure. If a notice of pending forfeiture is not filed within that time period, the property must be returned to the owner or interest holder. See A.R.S. § 13-4308(B) (2006).

*Absolute Immunity–Goddard*

Defendant Terry Goddard was Attorney General of Arizona during the time period relevant to this lawsuit. (Doc. 240 at 3.) Defendant Goddard began his tenure as Attorney General in 2003, and served until 2011. Defendant Goddard was the overall supervisor of Attorney General's office, employing approximately four hundred attorneys. (Doc. 237 at 27.) Defendant Goddard was generally involved in the management of the Office, in the strategic and tactical disposition of the Office's personnel, and in the public presentation of issues involving the Office in dealings with other government agencies. (Id.) Defendant Goddard was kept generally informed about the activities of the attorneys working in the

Office through monthly meetings with department heads, periodic meetings with section leaders, and briefings through his principal deputies. (Id.)

Defendant Goddard testified that he understood in a very general sense what the Financial Remedies Section of the Attorney General's Office was doing in connection with seizures of money transfers within the Western Union money transfer system. (Id. at 28.) His knowledge of those activities was derived from briefings. (Id.) Goddard had no actual connection with the seizure warrants that were served on Western Union. (Id.)

Plaintiffs contend that Defendant Goddard is not entitled to absolute immunity for either his failure to discontinue the program of mass seizure warrants or his refusal to return their money. (Doc. 253 at 12.) In April 2006, Fred Niehaus, Western Union's Senior Vice President of Public Affairs specifically complained to Goddard that the seizure warrants were damaging Western Union's business, that they were broad based and not focused, and did not distinguish between individuals. (Doc. 231 at 10.) In addition, Plaintiffs have challenged Goddard's immunity regarding his refusal to return their money, contending that he is not entitled to immunity for acts related to the retention of seized property. (Doc. 253 at 12.)

Citing Van de Kamp v. Goldstein, 555 U.S. 335 (2009), Defendants contend that Goddard cannot be held liable for any alleged supervisory failings related to activities by subordinates which are themselves covered by absolute immunity.

In Van de Kamp, the Supreme Court held that a supervisory prosecutor is absolutely immune for failing to adequately train and supervise district attorneys on the duty not to withhold impeachment evidence and failing to create any system for accessing information pertaining to the benefits provided to jailhouse informants. See id. at 344–45. The Court considered a prosecutor's methods of supervision of their prosecutors and concluded absolute immunity applied to those administrative tasks that "require legal knowledge and the exercise of discretion." Id. at 344. Prosecutors that are involved in training and supervisory activities are entitled to absolute immunity because these activities are directly connected with the conduct of the trial. Id. at 346.

Here, the conduct Plaintiffs challenge, whether Defendant Goddard should have discontinued or stopped the use of seizure warrants or his refusal to return money seized by those warrants, both have to do with the *in rem* proceedings initiated by Arizona Attorney General's office.  As such, Defendant Goddard's decision not to act is covered by absolute immunity because the activities at issue are directly connected with the conduct of the civil *in rem* proceedings.  See id. at 346.

*Official Capacity–Attorney General Horne*

Although Plaintiffs have alleged that the current Attorney General, Tom Horne, is a party in his official capacity as the head of the Attorney General's Office (see Doc. 141 at 3), they have not further alleged or argued how the Attorney General's office violated their constitutional rights.  In their response to Plaintiffs' motion for summary judgment, Defendants considered this claim abandoned and did not respond.  (Doc. 236 at 2.)

In § 1983 litigation, a local governmental unit may not be held responsible for the acts of its employees under a *respondeat superior* theory of liability. See Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Any alleged constitutional deprivation must be the product of a policy or custom of the local governmental unit because municipal liability must rest on the actions of the municipality, not the actions of the employees of the municipality. See id.  The Supreme Court has emphasized that "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  Id. at 405.

In their motion for summary judgment, Plaintiffs have not attempted to meet these rigorous standards of culpability and causation that must be established.  (Docs. 229, 230, 248 at 12-13.) Therefore, Plaintiffs' official capacity allegation against Attorney General Tom Horne must also be denied.

**CONCLUSION**

Accordingly, for the reasons set forth above,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IT IS HEREBY ORDERED GRANTING** Defendants' Cross-Motion for Summary Judgment.  (Doc. 240.)  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED DENYING** Plaintiffs Motion for Summary Judgment. (Doc. 229.)

DATED this 4th day of September, 2012.

Stephen M. McNamee
Senior United States District Judge